J. S18045/18

NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: C.M.R., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.R. AND T.R.R., | : | No. 54 WDA 2018 |
| NATURAL PARENTS | : | |

Appeal from the Decree, November 8, 2017,
in the Court of Common Pleas of Allegheny County
Orphans' Court Division at No. CP-02-AP-0000056-2016

BEFORE: STABILE, J., MUSMANNO, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.: FILED MAY 21, 2018

T.R. ("Mother") and T.R.R. ("Father") (collectively, "Parents") appeal from the November 8, 2017 decree entered in the Court of Common Pleas of Allegheny County, Orphans' Court Division, granting the petition of the Allegheny County Office of Children, Youth and Families ("CYF") and involuntarily terminating their parental rights to their dependent child, C.M.R., male child, born in June of 2004, pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b). After careful review, we affirm.

The trial court summarized the relevant procedural and factual history as follows:

> [C.M.R.], born [to Mother and Father], initially came to the attention of CYF in March, 2008. However, beginning in 2004, prior to CYF involvement, [C.M.R.]'s family had already begun to receive in-home assistance from numerous health service

providers at the recommendation of the children's pediatrician, out of concern that [C.M.R.] and his older brother J.R ([born in August] 2002) suffered developmental delays.

CYF's first interaction with [C.M.R.]'s family began [on] March 13, 2008, after CYF received a report that J.R., age five at the time, had appeared at school with bite marks and scratches and stated that [C.M.R.], his younger brother, had caused them. CYF conducted an investigation but did not accept the family into its program at that time as the family was already receiving multiple services including Wraparound, home health nurses, and skilled nursing care for the children who received between two to ten hours [of] care every day. CYF did however note some concern with the family's circumstances including the fact that J.R. and [C.M.R.] were unable to dress themselves, and were not toilet trained.

CYF next interacted with the family on September 7, 2008, when CYF received a second childline report alleging that Father had kicked 4-year-old [C.M.R.] Additionally, Mother reported that Father was physically abusive towards her. A CYF visit to the home revealed excessive clutter in the home and indications that the family suffered from a tendency to hoard. CYF also received reports of ongoing conflict and physical confrontations between the family members, and subsequently received additional reports of injuries to J.R.

On September 29, 2008, CYF received another childline report alleging that 4-year-old [C.M.R.] had hit J.R. leaving bruises, and that J.R. continued to arrive at school with bite marks and scratches caused by [C.M.R.] CYF conducted an investigation and provided the family with a behavioral specialist consultant.

In November 2008, CYF accepted the family for services as a result of repeated childline reports, and after Father admitted to hitting [C.M.R.] in the face.

CYF instituted a safety plan instructing Father not to use physical discipline. CYF provided the family with in-home services to help manage the excessive clutter in the home and address the family's reported problems with hoarding. The services continued until 2009 when they were reduced after service providers reported that Parents had made only minimal progress and failed to follow through with service provider's instructions unless staff were present in the home.

In March and April 2009, CYF received additional reports of injuries to J.R., and subsequent reports of failure by Parents to adequately supervise the children. In addition, CYF received multiple reports of physical aggression between the children, reports of the children playing in the street unsupervised, and reports that the children displayed bite marks, bruises, and scratches. The children were removed from the home on multiple occasions. In May and June 2011, CYF received two additional childline reports concerning the family. On February 15, 2012, [C.M.R.], along with his brother J.R. and sister A.R. were adjudicated dependent on grounds that the children suffered from a lack of supervision, and Parents displayed a lack of improvement in their ability to parent their children despite the provision of various services to aid them.

Because of [C.M.R.]'s developmental and behavioral problems, [C.M.R.] has been removed repeatedly from his [P]arents' care beginning in July [] 2008 when, at four years of age, he was admitted to Western Psychiatric Institute and Clinic (WPIC) after escalating displays of physical aggression. [C.M.R.] subsequently returned home on August 11, 2008, and during that time also resided with his maternal grandmother, until December 15, 2009 when he returned to WPIC after increasingly physically aggressive behavior. In January 2010, [C.M.R.] returned to the care of his maternal grandmother before moving to Residential Enhancement Services, Planning Opportunities for New Directions (RESPOND), a mental health facility for intensive

treatment of children with mental health disorders who have not succeeded at other facilities. He remained at RESPOND until October 14, 2011, when he returned home.

In September 2012, Mother admitted [C.M.R.] to the Mercy Behavioral Health Diversion and Acute Stabilization (DAS) program because of his increased aggression and destruction of property. He subsequently moved to a treatment foster home until December 3, 2012 when he moved to Auberle Shelter after incidents of physical aggression and threats to kill his foster family. [C.M.R.] then returned to his parents['] care for two days before readmission to WPIC after an emotional outburst while attending a psychological evaluation in the office of Dr. Patricia Pepe, a licensed psychologist.

Following his release from WPIC, [C.M.R.] resided at Auberle shelter and then Pressley Ridge crisis home until September 26, 2014. After a period in foster care from August 26, 2014 to December 28, 2014, he returned to WPIC after displays of aggression and homicidal and suicidal ideations. He returned to foster care until November, 2014, but after repeated threats of harm to his foster family, he was transferred to Southwood, then Auberle Shelter and the RESPOND program. After his behavior improved while at RESPOND, [C.M.R.] moved to a foster home on July 9, 2016, where he currently resides and where he continues to enjoy notable improvement in his behavior and functioning. His sister A.R. ([born in November] 2007) currently resides at the RESPOND facility. His brother J.R. currently resides in foster care.

Between 2011 and 2016, the children have undergone numerous psychological evaluations. In 2011 and 2012, Dr. Patricia Pepe, a licensed psychologist, evaluated [C.M.R.], his siblings J.R. and A.R., and Parents. Dr. Pepe diagnosed the three children as suffering from various mental health conditions and diagnosed Mother and Father as suffering from mental health problems as well. With

respect to [C.M.R.] in particular, Dr. Pepe diagnosed him with Pervasive Developmental Disorder, Mild Mental Retardation, Seizure Disorder, Mixed Receptive Expressive Language Disorder, and Cognitive Disorder.

In 2013, Dr. Pepe conducted evaluations of the family and noted an increase in the severity [of] [C.M.R.]'s "out of control" aggressive behaviors. In 2014, Dr. Pepe attempted to conduct another round of psychological evaluations of the family but was unable to do so after [C.M.R.]'s older brother J.R. physically attacked her. Thereafter, Dr. Pepe declined to conduct further evaluations of the family.

In the interim, Dr. Neil Rosenblum, a licensed psychologist, was assigned to evaluate the family, and conducted several psychological evaluations between 2014 and 2015. Dr. Rosenblum diagnosed [C.M.R.] with Pervasive Developmental Disorder NOS, Attention Deficit Disorder, Expressive-Receptive Language Disorder, Articulation Disorder, R/O Intermittent Explosive Disorder, Parent Child Relational Problem, Sibling Relational Problem, Mild Mental Retardation, and Seizure Disorder. He noted that [C.M.R.] suffered from a severity of psychosocial stressors, including removal from parents' care, multiple foster and group home placements, and recent psychiatric hospitalizations.

In 2016, Dr. Rosenblum declined to conduct further evaluations of the family, testifying at the TPR hearing that he felt his views as to the family were not consistent with the outcome CYF was seeking. Because of the difference of opinion in how he and CYF viewed the case, he declined to conduct any further psychological evaluations of the family. Dr. Pepe therefore resumed working with the family, and conducted final psychological evaluations of Parents and the three children 2016.

On March 28, 2016, CYF filed petitions for termination of the parental rights of Mother and Father. This Court initially conducted hearings on

the [termination of parental rights ("TPR")] petitions on April 8, 2016, July 1, 2016, October 7 2016, January 17, 2017 and April 21, 2017. However, following the Pennsylvania Supreme Court's decision in In [r]e[ Adoption of] L.B.M[, 161 A.3d 172 (Pa. 2017),] this Court appointed new counsel for each one of [the] three children, and de novo hearings on the TPR petitions commenced on September 8, 2017, September 14, 2017, September 25, 2017 and October 12, 2017. On November 8, 2017, this court entered an order terminating the parental rights of Mother and Father to [C.M.R.][Footnote 1] Parents filed a notice of appeal on December 5, 2017 . . . .

Trial court opinion, 1/8/17 at 2-8 (footnote omitted).

The record reflects that simultaneous with the filing of their notice of appeal to this court, Parents filed a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The trial court then filed its Pa.R.A.P. 1925(a) opinion.

Parents raise the following issues for our review:

[1.    Whether] the trial court erred in finding that [CYF] had proved grounds for termination under [23] Pa[.]C.S.A. [§] 2511(a)(2), (5) and (8)?

[2.    Whether] the trial court erred in finding that [CYF] had proved by clear and convincing evidence that the conditions which led to the removal of [C.M.R.] had not or could not be remedied within a reasonable period of time[?]

[3.    Whether] the trial court erred in finding that [CYF] had proved by clear and convincing evidence that termination of [Parents'] parental rights would best serve the developmental, physical and emotional needs and welfare of [C.M.R.] as required by [23] Pa.C.S.A. [§] 2511(b)[?]

Parents' brief at 6 (full capitalization omitted).[1]

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., 9 A.3d [1179, 1190 (Pa. 2010)].

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." In re M.G., 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f

---

[1] We note that in the argument section of their brief, Parents have abandoned their second issue on appeal and have only advanced arguments with respect to termination under 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b).

competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." In re Adoption of T.B.B., 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, guides the termination of parental rights and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re C.S., 761 A.2d 1197, 1201 (Pa.Super. 2000) (en banc), quoting Matter of Adoption of Charles E.D.M. II, 708 A.2d 88, 91 (Pa. 1998).

In this case, the trial court terminated Parents' parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), and (8), as well as (b).  We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b).  In re B.L.W., 843 A.2d 380, 384 (Pa.Super. 2004) (en banc).

Here, we analyze the court's termination decree pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

> (a)  General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> > (2)  The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> (b)  Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition

> filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Parents' parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." In re Adoption of C.D.R., 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting In re A.L.D., 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected

as untimely or disingenuous." In re A.L.D., 797 A.2d at 340 (internal quotation marks and citations omitted).

Here, in finding grounds for termination pursuant to Section 2511(a)(2), the trial court concluded that CYF presented clear and convincing evidence. After summarizing the testimony from the termination hearing, the trial court concluded:

> After careful review of the foregoing, this Court concludes that CYF presented credible testimony that, over the course of time during which Parents have been provided with assistance to address [C.M.R.]'s complex developmental, psychological needs and parent him effectively, they have enjoyed very limited success. Rather, despite the services provided to them to help them parent [C.M.R.], Mother and Father have been unable to remedy the circumstances that have rendered them unable to provide for [C.M.R.]'s wellbeing. Despite Parents' efforts over many years to provide for their child's needs, [C.M.R.] failed to display significant improvement in his behavior and ability to function until his most recent placements at the RESPOND home and subsequent move to a supportive foster care environment in the past year, where he is thriving. The improvements in [C.M.R.]'s capacity to function are described as "remarkable" especially when viewed in light of the extreme delays and behavioral health problems that he has suffered. While this Court has no doubt that a bond exists between Parents and [C.M.R.], the evidence and testimony presented at the TPR hearings indicates that despite many years of their efforts, Parents have been unable to provide the essential parental control and care necessary for [C.M.R.]'s well-being. This Court cannot wait indefinitely for Parents to develop the skills necessary to meet [C.M.R.]'s particular and individualized needs. Rather, this Court recognizes [C.M.R.]'s individual right to the [sic] have proper parenting and fulfillment of his

> potential in a permanent, healthy, safe environment which Parents, unfortunately, have been unable to provide. In re Adoption of R.J.S., 901 A.2d 502, 507 ([Pa.Super.] 2006). Given that [C.M.R.] now resides in a foster home in which he has developed a bond with his foster parents, where his psychological and behavioral health problems are well-managed, and where he is thriving, this Court concludes that [C.M.R.]'s developmental, physical and emotional needs and welfare will be best served by the termination of Mother and Father's parental rights.

Trial court opinion, 1/8/17 at 23-24.

In their brief, Parents contend that "they have substantially remedied the conditions which led to the child being removed." (Parents' brief at 15.) Parents then set forth testimony from the termination hearings to support their position. (Id. at 16-18.) Our standard of review, however, requires us to accept the trial court's factual findings and credibility determinations where they are supported by the record. See In re T.S.M., 71 A.3d at 267. Here, the record supports the trial court's factual findings and credibility determinations. Moreover, we have reviewed the record and find no error of law or abuse of discretion. We must, therefore, defer to the trial court. Id.

As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b). In re B.L.W., 843 A.2d at 384. We, therefore, need not address any further subsection of Section 2511(a) and turn to whether termination was proper under Section 2511(b).

As to Section 2511(b), our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa.Super. 2012). In In re E.M., 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. In re K.M., 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

In re T.S.M., 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." In re K.Z.S., 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." In re Z.P., 994 A.2d at 1121 (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of

many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

In re Adoption of C.D.R., 111 A.3d at 1219, quoting In re N.A.M., 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Our supreme court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." T.S.M., supra at 268. The court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." Id. at 269. The T.S.M. court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." Id.

Here, in determining that termination of Parents' parental rights favored C.M.R.'s needs and welfare, the trial court reasoned that C.M.R. has developed a bond with his foster parents, his psychological and behavioral problems are being well-managed, and that he is thriving. (Trial court opinion, 1/18/17 at 23-24.)

In their argument on this issue, Parents set forth select testimony of Dr. Neil Rosenblum in an effort to convince this court to reach a different result. (Appellant's brief at 21-23.) The trial court, however, was free to believe all, part, or none of the evidence presented and was likewise free to determine witness credibility and to resolve conflicts in the evidence. See In re M.G., 855 A.2d at 73-74 (citation omitted). Once again, our standard of review requires us to accept the trial court's factual findings and credibility determinations where, as here, they are supported by the record. See In re T.S.M., 71 A.3d at 267.

Upon review, we again discern no abuse of discretion. The record supports the trial court's finding that C.M.R.'s developmental, physical, and emotional needs and welfare favor termination of Parents' parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of C.M.R.'s needs and welfare, and as to the existence of a bond between Parents and C.M.R. that, if severed, would not have a detrimental impact on C.M.R. Therefore, as confirmed by the record, termination of Parents' parental rights serves C.M.R.'s developmental, physical, and emotional needs and welfare and was proper pursuant to Section 2511(b). While Parents profess to love C.M.R., a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. In re Z.P., 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the

ability to handle the responsibilities of parenting." Id. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his [or her] child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." In re B., N.M., 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Parents' parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/21/2018

- 16 -